```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,                           :
                                                    :
          -against-                                 :
                                                    :       **MEMORANDUM AND ORDER**
KYHEIM BETHEA,                                      :            15-cr-417 (DLI)
                                                    :
                         Defendant.                 :
----------------------------------------------------------------x
```

**DORA L. IRIZARRY, Chief Judge:**

On June 27, 2015, NYPD[1] Officers Mark Xylas and Ryan Galvin, and NYPD Sergeant Erek Powers arrested Defendant for driving under the influence of alcohol. During the course of the arrest, the officers discovered a quantity of marijuana and a loaded gun in the Vehicle Defendant was driving. On August 21, 2015, an Eastern District of New York grand jury returned a single count indictment charging Defendant with being a felon in possession of a firearm.[2] Defendant moved to suppress the marijuana and the gun, as well as statements he made to the officers during his arrest, based on alleged violations of his constitutional rights. The government opposed. On January 27, 2016, Officers Xylas and Galvin testified at a suppression hearing regarding Defendant's motion to suppress. At the suppression hearing continued on March 3, 2016, Officer Galvin concluded his testimony and Sergeant Powers testified.[3]

The Court makes the findings of fact set forth below from the officers' hearing testimony. *See* FED. R. CRIM. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the

---

[1] Unless otherwise indicated, the Court incorporates into this Memorandum and Order all party-name abbreviations and designations from the Memorandum and Order dated December 23, 2015 (the "December Order," Dkt. Entry No. 11) and the Summary Order dated January 7, 2016 (the "January Order," Dkt. Entry No. 14).

[2] On April 14, 2016, another grand jury returned a superseding indictment charging Defendant with a second count of being a felon in possession of a firearm. Dkt. Entry No. 22. This new charge is not the subject of this Memorandum and Order.

[3] References to "Jan. Tr." are to the January 27 hearing transcript and references to "Mar. Tr." are to the March 3 hearing transcript.

1

court must state its essential findings on the record."). As the Court finds this testimony to be detailed, credible, and reliable, and for the additional reasons discussed below, Defendant's motion to suppress is denied in its entirety.

**Background**

I. Facts

On June 27, 2015, at approximately 1:15 a.m., the officers observed Defendant driving erratically at a high rate of speed through the Bedford Stuvyesant section of Brooklyn, New York. Suspecting Defendant was intoxicated, the officers initiated a traffic stop, and Defendant maneuvered the Vehicle to the side of the street. After all three officers approached the Vehicle, Officer Xylas requested Defendant's pertinent documents and asked Defendant why he was driving erratically. Defendant responded that the Vehicle was a fast car. When asked whether he had consumed any alcohol, Defendant admitted that he had drunk a small amount. Officer Xylas noted that Defendant's speech was slurred, his eyes were bloodshot, and his breath smelled of alcohol.

Officer Xylas asked Defendant to step out of the Vehicle and Defendant complied. Upon exiting the Vehicle, Defendant was unstable in a standing position. Officer Xylas asked Defendant to walk toward the Vehicle's rear bumper, which Defendant accomplished by leaning on the Vehicle to balance himself. As Defendant walked toward the other two officers positioned near the rear of the Vehicle, Sergeant Powers engaged Defendant in pleasantries such as, "How is your night going?" Mar. Tr. 50:13-22.[4] At the same time, Officer Xylas walked around the front of the Vehicle from the driver side to the passenger side. The Vehicle's convertible roof was retracted, offering Officer Xylas an unimpeded view into the inside of the Vehicle. Additionally, although

---
[4] At the suppression hearing, Sergeant Powers could not recall Defendant's responses to these questions.

it was dark outside at the time of the stop, Defendant had pulled over directly underneath a street light, and Officer Xylas used his flashlight to aid his view of the Vehicle's interior. From outside the Vehicle's passenger side, Officer Xylas saw a plastic container filled with marijuana inside an open backpack on the passenger side floorboard. At roughly the same time that Officer Xylas discovered the marijuana, Defendant asked why Officer Xylas was searching his car and told the officers not to search the Vehicle. Officer Xylas then announced his discovery of the marijuana to the other officers, at which time Defendant was placed in handcuffs by Officer Galvin and Sergeant Powers.

The officers arrested Defendant for operating a motor vehicle under the influence of alcohol or drugs, reckless driving, and possession of marijuana. After being handcuffed, Defendant, a man of large stature, went limp and otherwise resisted the officers' attempts to place him in the police vehicle. For this, Defendant was also charged with resisting arrest. Eventually, Defendant was placed in a police vehicle and transported to the 81st Precinct for processing.

Sergeant Powers drove the Vehicle to the 81st Precinct, where he observed Officer Xylas conduct an inventory search of the Vehicle. In the trunk, Officer Xylas found a .380 caliber Bersa pistol loaded with seven rounds of ammunition. The trunk also contained various personal effects that belonged to Defendant.

Officers Xylas and Galvin then transported Defendant from the 81st Precinct to the 78th Precinct for alcohol testing to determine Defendant's level of intoxication. During the trip, Officer Xylas stated to Defendant, in sum and substance, that he should not have resisted arrest because doing so made the situation more difficult than necessary. Defendant then stated to the officers that he was a probation officer. Defendant made other statements during the trip from the 81st Precinct to the 78th Precinct, many of which were inculpatory. At no time during or before this

trip was Defendant given *Miranda* warnings.

After arriving at the 78th Precinct, Defendant was given a breathalyzer examination, the results of which showed a blood alcohol content of .075%. The breathalyzer was administered at approximately 3:40 a.m., two hours and twenty-five minutes after the officers initially stopped Defendant. Once the test was complete, Officer Xylas advised Defendant of his *Miranda* rights, which Defendant invoked.

Officers Xylas and Galvin then transported Defendant back to the 81st Precinct, and placed him in a cell in the prisoner holding area. As Officer Xylas was processing Defendant's paperwork, Defendant engaged Officer Xylas in conversation. Officer Xylas testified as follows concerning this exchange:

> [Officer Xylas]: [Defendant] made a statement to me, to which I responded.
>
> [AUSA Jacobs]: What did [Defendant] say?
>
> [Officer Xylas]: He stated that he knows that something's up, that this is taking too long, in sum and substance.
>
> [AUSA Jacobs]: Now, did you answer this question?
>
> [Officer Xylas]: Yes, I did. … I told him that we had found a gun in his car. … [Defendant] responded that it wasn't his car [and] I responded that it was found in a bag containing his personal property.
>
> [AUSA Jacobs]: And did [Defendant] say anything in response?
>
> [Officer Xylas]: Yes, that it was -- that would be his word versus mine.
>
> . . .
>
> [AUSA Jacobs]: Now, prior to [Defendant's] initial statement that something must be up, had you said anything to him?
>
> [Officer Xylas]: No.
>
> [AUSA Jacobs]: Did you have any other interactions with [Defendant] that morning?

4

[Officer Xylas]: Yes.

[AUSA Jacobs]: Can you describe those[?]

[Officer Xylas]: Sure. A short time later, I had left the cell area after that conversation[.] [W]hen I came back, he said, "Why do you have to do me like that? Why do you have to say it was in my bag?"

[AUSA Jacobs]: Did you say anything to Defendant before he made that statement?

[Officer Xylas]: No.

Jan. Tr. 82:17- 83:22.

## II. Procedural History

On November 13, 2015, Defendant filed a motion to suppress the marijuana, the gun, and the statements he made to the officers on the morning in question. Defendant did not assert, in either the motion or his supporting affidavit, that he was the Vehicle's registered owner or an authorized driver. *See generally* Def. Mot. Supp. and Def. Aff. On November 30, 2015, the government filed its opposition. Dkt. Entry No. 10.

By the December Order issued on December 23, 2015, the Court denied those portions of Defendant's motion that sought suppression of the physical evidence, as Defendant had not established an expectation of privacy in the places searched or the items seized, and further held that he was not entitled to an evidentiary hearing on this issue. The Court granted Defendant leave to correct these standing deficiencies by submitting a supplemental affidavit by no later than January 4, 2015. However, the Court cautioned Defendant that the statements contained in any affidavit submitted by him would be made under penalty of perjury, for which he could be subject to prosecution. Nonetheless, the Court held that Defendant was entitled to an evidentiary hearing only relating to the admissibility of statements he made following the traffic stop, which would be held on January 7, 2016. The Court further advised Defendant that if he wished to suppress the

5

physical evidence at the evidentiary hearing, he had to submit a supplemental affidavit, by no later than January 4, 2016, in which he established facts demonstrating an expectation of privacy in the Vehicle and the items seized.

On January 4, 2016, Defendant submitted a supplemental declaration in which he asserted that he "received permission to drive th[e] [V]ehicle from an authorized driver of the car who is a relative of the owner." Sup. Decl. at ¶ 3. However, he never identified the authorized driver or the owner of the Vehicle. On January 7, 2016, the Court issued the January Order, noting that Defendant's supplemental declaration did not resolve the Court's concerns regarding Defendant's lack of standing. January Order at 1-2. Although the Court granted the request for an evidentiary hearing, Defendant was cautioned that he retained "the burden of establishing a legitimate expectation of privacy in the Vehicle, either before or at the suppression hearing." *Id.* at 2. Defendant did not submit any additional evidence, nor did Defendant testify at the suppression hearing.

## Discussion

### I. Defendant Has Not Established a Reasonable Expectation of Privacy in the Vehicle

Despite the Court's warning that his supplemental declaration was insufficient to confer standing, Defendant continues to rely on his supplemental declaration to establish standing. The Court remains unpersuaded.

"It has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that his Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81 (1993) (citing *Alderman v. United States.*, 394 U.S. 165, 171–172 (1969) (additional citations omitted)). A defendant may only invoke the protection of the Fourth

Amendment where the government has "violated the defendant's own constitutional rights," as opposed to the rights of a third party. *United States v. Payner*, 447 U.S. 727, 732 (1980). This means that, in the context of a vehicle search, a defendant "must show, among other things, a legitimate basis for being in [the vehicle], such as permission from the owner." *United States v. Ponce*, 947 F.2d 646, 649 (2d Cir. 1991) (citing *United States v. Ochs*, 595 F.2d 1247, 1253 (2d Cir. 1979)); *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980) (finding defendant could not object to the search of a car where he had demonstrated "neither ownership of the [vehicle], nor license from the owner to possess the [vehicle]."). The burden rests with the defendant to demonstrate that he received such permission from the owner. *Sanchez*, 635 F.2d at 64. "Mere control over a vehicle" is insufficient to meet this burden. *United States v. Ruggiero*, 824 F. Supp. 379, 392 (S.D.N.Y. 1993).

At least one case from within this Circuit holds that a defendant's affidavit, standing alone, is insufficient to confer standing where the defendant simply offers "unsupported statements claiming he had permission from the owner" to use a vehicle. *United States v. Triana-Mateus*, 2002 WL 562649, at *3 (S.D.N.Y. Apr. 15, 2002); *see also Sanchez*, 635 F.2d at 64 (denying defendant standing, in part, based on the fact that "[t]he registered owner of the car … did not appear"). Here, Defendant makes a similarly unadorned assertion that he had permission to drive the Vehicle. The only difference between Defendant's affidavit and the one from *Triana-Mateus* is that Defendant does not even claim this authority from the unidentified owner, but merely an unidentified relative of the owner. As the government correctly observes, Defendant's affidavit is even less supportive of a legitimate expectation of privacy than the affidavit from *Triana-Mateus*, where the court denied standing. Thus, even if Defendant claimed that the owner allowed him to use the Vehicle, the Court still would deny his ability to challenge the search. However,

7

Defendant's affidavit does not even go that far. For this reason alone the declaration clearly is insufficient on its face.

Moreover, as noted in the January Order, even if the Court accepted Defendant's bald assertion that the relative gave him permission to use the Vehicle, the Court does not know whether the relative had authorization from the owner to lend the Vehicle to other drivers such as Defendant. Presumably, a defendant who borrowed a car from the original borrower would not be precluded from establishing standing if he could demonstrate: (1) the original borrower had authority to loan the car to others; and (2) the original borrower did in fact lend the car to the defendant. However, Defendant's supplemental affidavit does not state whether the relative had any authority to lend the Vehicle to a third party. Furthermore, even if Defendant did claim that the relative had such authority, such a statement would be hearsay unless Defendant could demonstrate that he had direct personal knowledge of that fact. As noted above, absent an affidavit or testimony from the relative or the original owner, "unsupported statements," particularly self-serving ones, from Defendant carry little weight in determining his expectation of privacy inside an allegedly twice-borrowed vehicle. *See United States v. Carter*, 2005 WL 180914, at *1 (S.D.N.Y. Jan. 25, 2005) (denying standing where "neither the registered renter of the car nor the third party who allegedly loaned the car to the defendant had come forth to corroborate defendant's claim of authorized use"). As Defendant lacks standing to contest the search and seizure of items found in the Vehicle, his motion to suppress this evidence is denied.[5]

## II. The Officers Had Probable Cause to Stop and Arrest Defendant

Defendant argues that his statements to the police should be suppressed under the "fruit of

---

[5] Because the Court finds that there was probable cause to stop and arrest Defendant (*see* Section II, *infra*), and further, because the Court finds that the officers conducted a valid inventory search, the gun would be admissible even if Defendant had standing.

8

the poisonous tree" doctrine announced in *Wong Sun v. United States*, 371 U.S. 471 (1963). Def. Mot. Supp. at 5. Defendant's contention is that, because the officers did not have probable cause to stop or arrest Defendant, the Court should suppress his statements as the "direct and immediate result of his illegal seizure." *Id.* Thus, although the Court found that Defendant does not have standing to suppress the tangible evidence, Defendant's *Wong Sun* argument nevertheless requires the Court to address the question of whether probable cause existed to arrest Defendant. Because Defendant's argument is meritless, it does not warrant extended discussion.

In short, the officers' testimony at the suppression hearing was eminently credible. They testified consistently with each other, and the inconsequential differences in their testimonies only demonstrated that they did not attempt to "get their story straight." Furthermore, their testimonies withstood the lengthy and capable cross-examination conducted by defense counsel. Accordingly, the officers' version of events, which the Court accepts as true, undeniably supports a finding of probable cause.

"The Fourth Amendment requires that an officer making [a traffic] stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) (citing *Whren v. United States,* 517 U.S. 806, 810 (1996)). The officers observed Defendant driving erratically and at a high rate of speed through a residential neighborhood at night. This was sufficient to establish probable cause to believe Defendant was driving under the influence of alcohol or drugs in violation of New York Vehicle Traffic Law ("VTL") § 1192, and that he was driving recklessly in violation of VTL § 1212. Therefore, the traffic stop was warranted.

As for Defendant's arrest, the officers had probable cause to arrest defendant for drunk

driving based on his slurred speech, bloodshot eyes, instability, and admission that he had consumed alcohol.

Additionally, probable cause existed to arrest Defendant for possession of marijuana in violation of New York Penal Law ("NYPL") § 221.05. With respect to the marijuana, Defendant claims that there was no probable cause for the arrest because the discovery of the marijuana was the product of an illegal search. Def. Mot. Supp. at 3-4. First, he argues that Officer Xylas' "automobile frisk" was an improper search because the circumstances did not warrant a reasonable belief that the Vehicle contained a weapon that could be used to harm the officers. *Id.* (citing *McCardle v. Haddad*, 131 F.3d 43, 48 (2d Cir. 1997)); *see also Michigan v. Long* 463 U.S. 1032, 1050 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968) ("[T]he search of the passenger compartment of an automobile … is permissible if the police officer possesses a reasonable belief … that the suspect is dangerous and the suspect may gain immediate control of weapons.")). Second, Defendant argues that Officer Xylas' conduct did not satisfy the "automobile exception," which allows the police to conduct a warrantless search of "an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991).

The problem with both of defendant's arguments is that they presume Officer Xylas searched the Vehicle, which he did not. "There is no legitimate expectation of privacy, shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *Texas v. Brown*, 460 U.S. 730, 740 (1983) (internal citations omitted). Officer Xylas viewed the marijuana from outside the Vehicle, where he or any member of the "the general public could peer into the interior" without violating Defendant's Fourth Amendment rights. *Id.* The fact that Officer Xylas used his flashlight to aid

his view is of no moment. *United States v. Lee*, 274 U.S. 559 (1927) ("[The] use of a searchlight is comparable to the use of a marine glass or a field glass. It is not prohibited by the Constitution."). Accordingly, because the discovery of the marijuana was proper, there was probable cause to arrest Defendant for marijuana possession.

### III. The Officers Did Not Violate Defendant's Fifth Amendment Rights

At the suppression hearing, the government notified the Court that it would seek to admit four categories of statements made by Defendant on the morning in question. These statements include: (1) Defendant's responses to Officer Xylas' questions immediately after the stop, while Defendant was still inside the Vehicle; (2) Defendant's question regarding why the officers were searching the Vehicle, and his request that they not search the Vehicle, just before Defendant was placed under arrest; (3) Defendant's statement that he was a probation officer, which he made during the ride from 81st Precinct to the 78th Precinct; and (4) Defendant's statements to Officer Xylas in the prisoner holding area of the 81st Precinct. Mar. Tr. 81:15-83:25. Defendant was not given *Miranda* warnings until after the results of the breathalyzer examination were returned, which occurred just prior to the return trip from the 78th Precinct to the 81st Precinct. Thus, the first three categories of statements were made before Defendant was *Mirandized* and the fourth category of statements was made after.

Police are required to administer *Miranda* warnings only when a suspect is subjected to "custodial interrogation." *United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) (quoting *Miranda v. Arizona*, 384 U.S. 444, 447 (1966)). Thus, if a suspect is not in custody while being interrogated, or is not interrogated while in custody, the protections of *Miranda* are not triggered. *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) ("It is clear … that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but

11

rather where a suspect in custody is subjected to interrogation."); *Cruz v. Miller*, 255 F.3d 77, 81 (2d Cir. 2001) (quoting *New York v. Quarles*, 467 U.S. 649, 664 (1984) (O'Connor, J., concurring in part and dissenting in part) ("Miranda warnings are required only when there is both 'custody' and '"interrogation"'").

To determine whether a suspect is in custody for *Miranda* purposes, a court first must determine "'whether, in light of the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Howes v. Fields*, 132 S. Ct. 1181, 1189-90 (2012) (alternation in original) (first quoting *Stansbury v. California*, 511 U.S. 318, 322–323 (1994) (per curiam); then quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). A suspect's assessment of his "freedom of movement" must be judged according to "all of the circumstances surrounding the interrogation." *Stansbury*, 511 U.S. at 325. However, the ability to terminate an encounter with the police "is simply the first step in the analysis" because "[n]ot all restraints on freedom of movement amount to custody." *Howes*, 132 S. Ct. at 1190. A court must also evaluate "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* In this vein, a person is not in custody for *Miranda* purposes while being questioned along the side of the road during a routine traffic stop. *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).

Interrogation includes not only express questioning, but also "its functional equivalent," which the Supreme Court defines as "any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301 (footnotes omitted). Whether the police conduct in question is likely to elicit an incriminating response depends "upon the perceptions of the suspect, rather than the intent of the police." *Id.* A court should not find that interrogation has occurred merely because the

words or actions of the police "struck a responsive chord" in a defendant. *Id.* at 303. Instead, a *Miranda* violation occurs only when "suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." *Id*. at 302; *Acosta v. Artuz*, 575 F.3d 177, 190 (2d Cir. 2009) (emphasizing that, under *Innis*, an incriminating statement "must [be] … *the product of words or actions on the part of the police*" to warrant suppression) (alterations and emphasis in original).

Here, Defendant was not in custody until Officer Galvin and Sergeant Powers placed him in handcuffs as he was standing near the rear of the Vehicle. At the suppression hearing, the officers testified that Officer Xylas discovered the marijuana at approximately the same moment Defendant told the officers not to search the Vehicle. Officer Xylas then announced that he had found the marijuana, and *then* Officer Galvin and Sergeant Powers handcuffed Defendant. According to this sequence of events, Defendant's statements about the officers searching his car occurred before he was handcuffed. While Defendant certainly was not "free to leave" prior to this point, routine traffic stops, such as the one that occurred in this case, do not "require that [a suspect] be warned of his constitutional rights." *Berkemer*, 468 U.S. at 437. Thus, because Defendant was not in custody until the moment he was handcuffed, the statements Defendant made while still inside the Vehicle (the first category), and the statements Defendant made while at the rear of the Vehicle (the second category) are admissible.

After he was handcuffed and placed in a police car, Defendant inarguably was in custody throughout the remainder of the morning of June 27, 2015. However, the only time Defendant was interrogated that morning was when Officer Xylas questioned Defendant while he was still inside the Vehicle. After Defendant exited the Vehicle, Sergeant Powers engaged Defendant in pleasantries, which simply cannot be deemed interrogation or its functional equivalent. Moreover,

13

Defendant's statements about the officers searching his car were not "the product of" Sergeant Powers' casual banter with Defendant. If anything, Defendant's statements were more than likely a response to Officer Xylas looking into the Vehicle, an "action," which also does not qualify as interrogation or its functional equivalent.

Defendant's statement that he was a probation officer also does not warrant suppression under the dictates of *Miranda* and *Innis*. While traveling in the police car from the 81st Precinct to the 78th Precinct, Officer Xylas told Defendant that he should not have resisted arrest. That this statement "struck a responsive chord" with Defendant, "is not enough, by itself, to equate the conduct to '"interrogation."'" *Acosta v. Artuz*, 575 F.3d at 190 (quoting *Innis*, 446 U.S. at 303). Rather, the issue is whether Officer Xylas "should have known" that his statement was "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301. Officer Xylas' statement appears to have been nothing more than an isolated and unremarkable factual observation that Defendant's obstructive behavior was ill advised. True, this comment concerned one of the crimes for which Defendant was arrested, so it was somewhat more likely to elicit an incriminating response than a comment about the weather. However, "[t]he *Innis* definition of interrogation is not so broad as to capture within *Miranda's* reach all declaratory statements by police officers concerning the nature of the charges against the suspect and the evidence relating to those charges." *Acosta*, 575 F.3d at 191 (2d Cir. 2009) (quoting *Caputo v. Nelson*, 455 F.3d 45, 50 (1st Cir.2006) (internal quotation marks omitted)). Indeed, the Second Circuit has cited with approval a Seventh Circuit case in which the police informed a murder suspect that multiple witnesses had identified him as the killer and that he faced the death penalty if convicted. *Id.* (citing *Easley v. Frey*, 433 F.3d 969, 974 (7th Cir.2006)). The Seventh Circuit held that this "matter-of-fact communication of the evidence against [the defendant] and the potential punishment he faced" was not the

14

functional equivalent of interrogation. *Id.* (quoting *Easley*, 433 F.3d at 974). Similarly, in this case, Officer Xylas' statement was simply a "matter-of-fact communication" that Defendant should not have resisted arrest. Indeed, in this instance, the officer's remark certainly was far less likely to elicit an incriminating response than telling a suspect that he had been identified as a murderer and might be executed.

Finally, Defendant's statements while in the prisoner holding area of the 81st Precinct were also not the product of interrogation. It is black letter law that when a suspect in custody "'expresse[s] his desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Arizona v. Mauro*, 481 U.S. 520, 525–26 (1987) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) (second alteration in original)). Although Defendant had invoked his right to counsel by the time he was in the holding area, Defendant initiated the conversation with Officer Xylas by asking why his processing was taking so long. His statement was entirely voluntary and unprovoked. *Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today"). Moreover, the fact that Officer Xylas obliged Defendant's request for information about "the nature of the charges against the suspect and the evidence relating to those charges" should not be held against the government. *Acosta*, 575 F.3d at 191 (2d Cir. 2009). For these reasons, Defendants statements need not be suppressed.

## **Conclusion**

For the foregoing reasons, Defendant's motion to suppress is denied in its entirety.

SO ORDERED

Dated: Brooklyn, New York
      June 8, 2016

/s/
Dora L. Irizarry
Chief Judge